FILED

2012 Jan-09 PM 03:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JEFFERSON TRANSPORTATION, LLC, | } | |
| | } | |
| Plaintiff, counter-defendant, and cross-claimant, | } | CIVIL ACTION NO. |
| | } | |
| | } | CV-10-AR-3250-S |
| v. | } | |
| | } | |
| RAIL CONNECTION, INC., | } | |
| | } | |
| Defendant and counter-claimant, | } | |
| | } | |
| SCTRR, LLC, | } | |
| | } | |
| Defendant and cross-defendant, | } | |
| | } | |
| SOUTH CENTRAL RAIL MANAGEMENT, LLC, | } | |
| | } | |
| Defendant and cross-defendant. | } | |

**MEMORANDUM OPINION**

The court has before it three motions filed by defendants and cross-defendants, SCTRR, LLC ("SCTRR") and South Central Rail Management, LLC ("South Central Rail Management"): 1) a motion to dismiss count II (promissory fraud) of the first amended complaint filed by plaintiff, counter-defendant, and cross-claimant, Jefferson Transportation, LLC ("Jefferson"), and to dismiss South Central Rail Management as a defendant altogether, doc. 57; 2) a motion to dismiss or strike Jefferson's crossclaim, doc. 66; and 3) a motion for judgment on the pleadings, doc. 67. For the reasons

that follow, the motion for judgment on the pleadings, doc. 67, will be granted, which renders moot the issues raised in the motion to dismiss, doc. 57.[1]  The motion to strike, doc. 66, will also be granted.

### Background

On October 20, 2010, Jefferson filed a lawsuit in the Circuit Court of Jefferson County, Alabama, against SCTRR, South Central Rail Management, Rail Connection, Inc. ("Rail Connection"), South East Rail, Inc., and South Central Tennessee Railroad Corporation, for damages related to ten railcars that Jefferson alleged were damaged beyond repair and left inoperable on SCTRR's railroad.

Jefferson's first amended complaint alleges the following facts.  SCTRR owns and operates a short (40 mile) railroad in

---

[1] In their motion to dismiss, SCTRR and South Central Rail Management seek to dismiss Jefferson's promissory fraud claim on the ground that it was not asserted with sufficient particularity under Fed. R. Civ. P. 9(b).  In its response brief, Jefferson consented to the court's dismissal of its promissory fraud claim. Also in their motion to dismiss, SCTRR and South Central Rail Management seek dismissal of South Central Rail Management as a defendant altogether because the first amended complaint fails to allege any facts that would give rise to liability against it. Also in its response brief, Jefferson consented to South Central Rail Management's dismissal, subject to the request that such dismissal is without prejudice, and Jefferson requests the right to re-name South Central Rail Management as a defendant in this action should discovery reveal that South Central Rail Management used SCTRR as its alter ego or that Jefferson is otherwise entitled to "pierce the corporate veil" or pursue any similar cause of action under applicable law.  For reasons discussed *infra*, Jefferson's request to reserve the right to re-name South Central Rail Management as a defendant is due to be denied, and South Central Rail Management will be dismissed **with prejudice**.

Tennessee.  On June 24, 2005, Rail Connection leased 42 railroad cars that it owned to SCTRR for SCTRR to use on its railroad.  The lease required the cars to bear the reporting marks of the Tennken Railroad, a railroad licensed by the federal government.  On July 29, 2005, Rail Connection sold the cars to Jefferson, which is engaged in the business of hauling and recycling scrap metal.  On the same day, Rail Connection assigned the lease of the cars to Jefferson, including all of its rights under the lease.  After July 29, 2005, the lease continued to operate, with SCTRR paying Jefferson rather than Rail Connection for the use of the cars. SCTRR and Jefferson agreed to terminate the lease on January 1, 2007, and under the terms of the lease, the cars were to be returned to Jefferson within 30 days of termination, i.e., by January 31, 2007.  SCTRR returned 32 of the railcars to Jefferson, but ten were not returned because they had been damaged during use, rendering them inoperable.  The ten damaged railcars remain in SCTRR's facilities in Tennessee.

Jefferson's first amended complaint asserts four state law causes of action: 1) breach of contract against all defendants; 2) fraud against Rail Connection only; 3) promissory fraud against "the South Central defendants" only; and 4) a request for a declaratory judgment as to "the South Central defendants" only. Each of the counts against "the South Central defendants" relates to alleged breaches of the June 24, 2005 lease agreement, a copy of

which is attached to the first amended complaint.

The defendants removed the case to this court on November 24, 2010, on diversity grounds.  Rail Connection answered the first amended complaint and asserted a counterclaim against Jefferson for breach of contract and unjust enrichment.  Jefferson answered Rail Connection's counterclaim, and in the same pleading asserted a "crossclaim" against SCTRR and South Central Rail Management for breach of contract and unjust enrichment.  The declaratory judgment count in Jefferson's first amended complaint already requested equitable relief for the same conduct complained of in Jefferson's crossclaim.  South Central Tennessee Railroad Corporation and South East Rail, Inc., were then dismissed from the case, leaving Rail Connection, SCTRR, and South Central Rail Management as the defendants.  Subsequently, SCTRR and South Central Rail Management filed the instant motions to dismiss, doc. 57, to strike, doc. 66, and for judgment on the pleadings, doc. 67.  Jefferson has responded, docs. 71 and 72, and SCTRR and South Central Rail Management have replied, doc. 73.

## Discussion

In support of their motion for judgment on the pleadings,[2] SCTRR and South Central Rail Management argue that all of

---

[2] As both parties have submitted matters outside the original pleadings, the motion for judgment on the pleadings will be treated as one for summary judgment. *See* Fed. R. Civ. P. 12(d) and 56(c).

Jefferson's state law causes of action against them are preempted by provisions in the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 10101 *et seq.*, which is a federal regulatory scheme that covers the activity of providing railcars to a rail carrier for the purpose of moving cargo by rail.  Further, SCTRR and South Central Rail Management contend that even if Jefferson had filed suit to recover damages under the applicable provisions of the ICCTA, its claim is time barred under the statutes of limitation applicable to claims filed pursuant to the federal regulatory scheme.

Congress modified the Interstate Commerce Act by enacting the ICCTA in 1995, which grants the United States Surface Transportation Board ("STB") the authority to regulate all activity related to the performance of railway services to the extent such regulation is allowed by the ICCTA.  49 U.S.C. § 10102 defines the functions that are included within rail service and are thus subject to federal regulation.  Jefferson does not dispute SCTRR and South Central Rail Management's contention that under the definitions set forth in § 10102, Jefferson was engaged in "car service" under the ICCTA, which is defined to include "the use, control, supply, movement, distribution, exchange, interchange, and return of locomotives, cars, other vehicles, and special types of equipment used in the transportation of property by a rail carrier, and (B) the supply of trains by a rail carrier."  49 U.S.C. §

10102(2).  Indeed, Jefferson was engaged in "car service" because it supplied railcars used in the transportation of property by a "rail carrier," i.e., SCTRR.  Jefferson also does not dispute SCTRR and South Central Rail Management's contention that both Jefferson and SCTRR are "rail carriers" under the ICCTA, which is defined as "a person providing common carrier railroad transportation for compensation." *Id.* § 10102(5).  "Railroad" is defined to include "(A) a bridge, car float, lighter, ferry, and intermodal equipment used by or in connection with a railroad; (B) the road used by a rail carrier and owned by it or operated under an agreement; and (C) a switch, spur, track, terminal, terminal facility, and a freight depot, yard, and ground, used or necessary for transportation." *Id.* § 10102(6).  "Transportation" is defined to include "(A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property." *Id.* § 10102(9).  SCTRR is a "rail carrier" under § 10102 because it provided common carrier railroad transportation for compensation, and Jefferson is also a "rail carrier" under the statute because it provided railcars to SCTRR for the movement of

6

property by rail for compensation.[3]

The ICCTA provides that car hire or "car service" in the railroad industry is expressly regulated by the STB.  49 U.S.C. § 11122 provides:

> (a) The regulations of the Board on car service shall encourage the purchase, acquisition, and efficient use of freight cars. The regulations may include--
>
> (1) the compensation to be paid for the use of a locomotive, freight car, or other vehicle;
>
> (2) the other terms of any arrangement for the use by a rail carrier of a locomotive, freight car, or other vehicle not owned by the rail carrier using the locomotive, freight car, or other vehicle, whether or not owned by another carrier, shipper, or third person; and
>
> (3) sanctions for nonobservance.

49 U.S.C. § 11122(a)(1)-(3).  The federal regulations that were enacted pursuant to § 11122, found at 49 C.F.R. § 1033.1, provide

---

[3] *See also Lone Star Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967) (establishing the factors for determining whether an entity is acting as a rail carrier as follows: 1) actual performance of rail service, 2) the service being performed is part of the total rail service contracted for by a member of the public; 3) the entity is performing as part of a system of interstate rail transportation by virtue of common ownership between itself and a railroad or by a contractual relationship with a railroad, thus deemed to be holding itself out to the public; and 4) remuneration for the services performed is received in some manner); *Assoc. of P & C Dock Longshoremen v. The Pittsburgh and Conneaut Dock Co.*, 8 I.C.C. 2d 280, 294, 1992 WL 30836, at *6 (I.C.C. 1992) (in which the STB adopted the Fifth Circuit's definition of a rail carrier).

in relevant part:

> (a) Definitions applicable to this section:
>
> (1) Car. A freight car bearing railroad reporting marks, other than an excluded boxcar as defined in § 1039.14(c)(2) of this chapter whenever it is owned or leased by any class III carrier and bears a class III carrier's reporting marks.
>
> (2) Car hire. Compensation to be paid by a user to an owner for use of a car. Such compensation may include, but need not be limited to, hourly and mileage rates.
>
> . . .
>
> (5) Owner. A rail carrier entitled to receive car hire on cars bearing its reporting marks.
>
> . . .
>
> (7) User. A rail carrier in possession of a car of which it is not an owner.

49 C.F.R. § 1033.1(a)(1)-(2), (5), (7).  Section 1033.1 also expressly adopts the Code of Car Hire rules and Interpretations - Freight, which is published by the Association of American Railroads, in order to regulate the prescribed rates of compensation ("car hire") for use of railcars by rail carriers. *See* 49 C.F.R. § 1033.1(a)(6).  Section 1033.1 goes on to state:

> The Code of Car Hire Rules referenced in the Association of American Railroad's Car Service and Car Hire Agreement provides that owners and users party to that agreement **shall**

8

> **resolve car hire disputes thereunder.** The
> Board may review allegations of abuse of the
> car hire dispute resolution process
> established under those rules.

49 C.F.R. § 1033.1(c)(ii)(emphasis added).  SCTRR and South Central Rail Management argue that Jefferson's activity of supplying railcars to SCTRR falls within these regulations.  Jefferson, an "owner," provided railcars to SCTRR, a "user," for use on its railroads.  The lease they entered into required the railcars to carry the reporting marks of the Tennken Railroad, as provided for in § 1033.1(a)(1).  By placing its cars in interchange service with railroad markings, the cars were entitled to move between railroads across the North American rail system.  Jefferson received compensation for the use of its railcars from the railroads on which they moved.  To receive this compensation, Jefferson subjected itself to the federal regulations in the Code of Car Hire Rules and Interpretations - Freight, published by the Association of American Railroads.[4]  Under these regulations, any dispute related to the supply of cars to railroads is subject to federal law and regulations.  *See* § 1033.1(c)(ii).

Moreover, SCTRR and South Central Rail Management argue that all of Jefferson's state law claims for damages, which arise out of the alleged failure of SCTRR to pay for "car service," are

---

[4] SCTRR and South Central Rail Management attached the Code of Car Hire Rules and Interpretations - Freight to its motion for judgment on the pleadings.

preempted under § 10501 of the ICCTA.  As part of the federal regulatory scheme, § 10501 reserves jurisdiction over transportation by rail carrier to the STB as follows:

> (a)(1) Subject to this chapter, the Board has jurisdiction over transportation by rail carrier that is--
>
> (A) only by railroad; or . . .
>
> (b) The jurisdiction of the Board over--
>
> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers . . . **is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.**

49 U.S.C. § 10501(a)-(b)(emphasis added).  The broad preemptive effect of the last sentence of § 10501(b) has been acknowledged by a number of courts.  *See CSX Trans., Inc. v. Georgia Pub. Serv. Comm.,* 944 F. Supp. 1573, 1581-82 (N.D. Ga. 1996) ("It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations . . . [I]t is clear to the Court that Congress intended the preemptive net of the ICC Termination Act to be broad by extending exclusive jurisdiction to the STB over anything included within the general and all

10

inclusive term 'transportation by rail carrier.'"); *Pace v. CSX Trans., Inc.*, 613 F.3d 1066, 1069 (11th Cir. 2010) ("the language of § 10501(b) plainly conveys Congress's intent to preempt all state law claims pertaining to the operation or construction of a side track"). Accordingly, SCTRR and South Central Rail Management argue that Jefferson's state law claims, because they each arise out of SCTRR's alleged failure to pay compensation related to its use of Jefferson's rail cars per the terms of the lease, are preempted by federal law.

SCTRR and South Central Rail Management note that Jefferson could have filed a proper claim in a timely manner under § 11704 of the ICCTA. That section, entitled "Rights and remedies of persons injured by rail carriers," creates a cause of action against a rail carrier, such as SCTRR. Section 11704(b) provides that "[a] rail carrier providing transportation subject to the jurisdiction of the Board under this part is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of this part." 49 U.S.C. § 11704(b). Section 11704(c)(1), in turn, provides that "[a] person may file a complaint with the Board under section 11701(b) of this title or bring a civil action under subsection (b) of this section to enforce liability against a rail carrier providing transportation subject to the jurisdiction of the Board under this part." *Id.* § 11704(c)(1). However, SCTRR and South Central Rail Management argue that Jefferson may not **now**

11

assert a proper claim under § 11704 because § 11705 of the ICCTA bars any such claim as untimely.  Section 11705 sets forth the statutes of limitation for claims that fall under the jurisdiction of the STB, and provides:

> (a) A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part must begin a civil action to recover charges for transportation or service provided by the carrier within 3 years after the claim accrues . . .
>
> * * *
>
> (c) A person must file a complaint with the [Surface Transportation] Board to recover damages under Section 11704(b) of this title within 2 years after the claim accrues.

49 U.S.C. § 11705(a), (c).  Jefferson, as a rail carrier, was providing a service (i.e. "car service") to SCTRR.  Jefferson has brought a civil action to recover "charges" related to that car service.  All of Jefferson's alleged damages arise from its provision of car service to SCTRR.  Thus, Jefferson's claims are governed by the three year statute of limitations under § 11705(a).  Alternatively, Jefferson could have asserted a claim under § 11704(b), which creates a cause of action against a "rail carrier providing transportation" that causes damage based on "an action or omission of that carrier in violation of this part."  This claim would be subject to the two year statute of limitations set forth in § 11705(c).  *See Modin v. New York Cent. Co.*, 650 F.2d 829, 834 (6th Cir. 1981) (interpreting the pre-1995 Interstate Commerce

12

Act's similar provision to § 11705, stating "[i]t is well settled that the limitation applies to complaints filed in the courts as well as those filed with the I.C.C."). Jefferson's claims for damages accrued at the latest on February 1, 2007, when SCTRR allegedly failed to return ten of the railcars within 30 days of Jefferson's cancellation of the lease on January 1, 2007. However, Jefferson did not file this lawsuit until October 20, 2010, well over three years later. As such, Jefferson's claims are barred by the statutory limitations set forth in 49 U.S.C. § 11705, regardless of whether the three-year or two-year statute of limitations applies.

In sum, SCTRR and South Central Rail Management argue that Jefferson's state law claims for damages arise out of SCTRR's alleged failure to pay proper compensation for "car service" that Jefferson provided to SCTRR, they are subject to the ICCTA's federal regulatory scheme and are thus preempted by § 10501(b) of the ICCTA, and because they accrued at the latest on February 1, 2007, but Jefferson did not file suit until October 20, 2010, they are time-barred by the statutory limitations in § 11705 of the ICCTA.

Jefferson responds that the lease agreement on which its state law claims are based is actually subject to a provision of the ICCTA that expressly exempts certain contracts from regulation and preemption by the ICCTA, thus allowing parties to such a contract

to pursue state law breach of contract claims (and, in turn, exempting the claims from the ICCTA's statutes of limitation). Indeed, the ICCTA also provides that private contracts may be entered into between rail carriers and "purchasers of rail services", the breach of which can be remedied via state court causes of action. 49 U.S.C. § 10709 provides:

> (a) One or more rail carriers providing transportation subject to the jurisdiction of the Board under this part may enter into a contract with one or more purchasers of rail services to provide specified services under specified rates and conditions.
>
> (b) A party to a contract entered into under this section shall have no duty in connection with services provided under such contract other than those duties specified by the terms of the contract.
>
> (c)(1) A contract that is authorized by this section, and transportation under such contract, shall not be subject to this part, and may not be subsequently challenged before the Board or in any court on the grounds that such contract violates a provision of this part.
>
> (2) The exclusive remedy for any alleged breach of a contract entered into under this section shall be an action in an appropriate State court or United States district court, unless the parties otherwise agree. This section does not confer original jurisdiction on the district courts of the United States based on section 1331 or 1337 of title 28, United States Code.

49 U.S.C. § 10709(a)-(c). Relying on § 10709, Jefferson argues

that the lease it entered into with SCTRR is a contract for "specified services under specified rates and conditions," and is thus exempt from the jurisdiction of the ICCTA or the STB, which leaves Jefferson free to bring a state law breach of contract action to enforce the lease.[5]

As Jefferson correctly states, in order to determine whether Jefferson's state law claims are preempted by the ICCTA, the court must decide whether the lease agreement entered into between Jefferson and SCTRR is a private contract between a rail carrier and a "purchaser of rail services" subject to specified rates and conditions under § 10709 (and thus removed from the STB's jurisdiction), or an agreement to provide "car service" subject to federal regulation under 49 U.S.C. § 11122 and 49 C.F.R. § 1033.1.

Jefferson argues that the lease is a § 10709 private contract because it specifies the rates and conditions of carriage agreed upon by the parties, rather than defaulting to the rates and conditions promulgated by the STB for rail carriers. Jefferson states that the terms of the lease state that SCTRR would lease the railcars for $325 per car, per month, without making reference to any tariff promulgated by the STB related to rates and conditions for car hire. Further, Jefferson states that the STB's tariff that was in effect at the time the lease was in effect, Freight Tariff

---

[5] Further, Jefferson argues that its state law claims are not time barred under Alabama's six-year statute of limitations for actions on a contract. *See* Ala. Code § 6-2-34(9).

ICC ASLG 6007, provided a different rate for car hire (1.5 cents per mile) than the $350 rate specified in the lease.[6]   Jefferson asserts that there is no evidence that the parties relied on the STB's rules or rates for car hire or "car service" or otherwise intended to have the lease be governed by federal law.

However, the plain language of the lease agreement belies Jefferson's assertions.  Section 3 of the lease agreement provides as follows:

> 3.   **Car Hire Accounting and Earnings:**
>
> (a) For purposes of Section 3, the following definitions shall apply:
>
> BASE EARNINGS - The amount determined by multiplying $325 by the actual number of Units subject to this Lease for any given month during the Term of the Lease.  In the event that any Unit is not subject to this Lease for a complete calendar month, such Base Earnings shall be prorated on a daily basis.
>
> EARNINGS - **Lessor shall be entitled to 100% of all off-line care hire earnings.**
>
> **(B) The units will be stenciled with reporting marks owned by Lessee and Lessor shall be responsible for all car hire accounting functions and the costs associated therewith.**
>
> The Lessor shall compare Earnings received for each consecutive three-month period during the Term of the Lease against Base Earnings for that same period ("Settlement Period").   In the event that the Earnings are less than the

---

[6] Jefferson attached to its response in opposition to judgment on the pleadings a copy of the tariff that was in effect at the time the lease was in effect.

> Base Earnings for a Settlement Period
> ("Shortfall"), the Lessor shall notify Lessee
> in writing of such Shortfall.  Lessee shall
> remit the Shortfall to Lessor within 30 days
> of such written notice from Lessor.

(emphasis added).  As is clear from the bolded sections, the lease
specifically relies upon the Car Hire rules that govern fees for
"car service" under the ICCTA.  Contrary to Jefferson's assertion,
the lease merely sets $325 per month as the "Base Earnings" that
the Lessor [Jefferson] is owed and provides that the "Lessor shall
be entitled to **100% of all off-line car hire earnings**."  (emphasis
added).  These car hire earnings are set forth in the rules adopted
by the STB - they are not a specified rate in the lease, as alleged
by Jefferson.  Rather, one must refer to the Car Hire rules
promulgated by the STB in order to determine the amounts due to
Jefferson for the "off-line car hire earnings."  The lease only
requires the Lessee [SCTRR] to pay any "Shortfall" between the
actual car hire earnings and the "Base Earnings."  In other words,
SCTRR only had to guarantee that the fees earned by the cars would
average a monthly minimum calculated over three months.  In this
way, the lease defaults to the rates and conditions for car hire
promulgated by the STB for rail carriers.  Section 8 of the lease
also references the STB's regulations for car service, providing
that Jefferson's cars were to be run and maintained subject to the
Association of American Railroad's interchange rules, stating:
"Lessee shall not repair, or authorize the repair of, any of the

17

Units without Lessor's prior written consent, except that running repairs, as specified in the Association of American Railroads Rules for Interchange and the Canadian Transport Commission regulation governing interchange (together "Interchange Rules") may be performed by railroads or hauling carriers without Lessor's prior written consent."  In sum, the lease allowed Jefferson to earn fees from railroads that use its cars, which is "car service," or SCTRR's use of Jefferson's cars for this purpose.  Those fees constitute "car hire" and are subject to the regulations in 49 C.F.R. § 1033.1(a)(6), which incorporates the Car Hire Rules governing the use of leased cars by rail carriers.  Rather than "contracting out" of the ICCTA, as Jefferson contends, the language of the lease evidences an intent by the parties to be subject to the ICCTA and STB's regulation of car service.

Jefferson's position is also belied by the fact that typically, contracts pursuant to § 10709 have involved the purchase of rail carrier services by a **shipper**, setting specific terms for the transportation of specific freight.  The STB has proposed that the word "contract" as found in § 10709 should be defined as "any bilateral agreement between a carrier and a **shipper** for rail transportation **in which the railroad agrees to a specific rate for a specific period of time in exchange for consideration from the shipper**, such as a commitment to tender a specific amount of freight during a specific period or to make specific investments in

18

**rail facilities**." *See Babcock & Wilcox Co. v. Kansas City Southern Ry. Co.* 557 F.3d 134, 140 (3rd Cir. 2009) (quoting *Interpretation of the Term "Contract" in 49 U.S.C. § 10709*, 2007 WL 934379, at *4, STB Ex Parte No. 669 (STB March 6, 2008))(emphases added).  Indeed, most of the cases cited by Jefferson in support of its position that the lease is a private contract and thus governed by § 10709 involve disputes between rail carriers providing transportation pursuant to contracts with shippers to provide specified services under specified rates and conditions.[7]  Although Jefferson alleges that it is in the business of hauling and recycling scrap metal,

---

[7]*See, e.g., Glenn Hunter & Associates, Inc. v. Union Pac. R. Co.,* 135 F. App'x 849, 854 (6th Cir. 2005) (in a case dealing with a lost shipment of refractory brick, noting that "if they choose to do so, parties can enter into contracts for interstate **shipments** that are free of oversight by the [STB]") (emphasis added); *Babcock and Wilcox, supra* (long term shipment of steel power boilers); *Dow Chem. Co. v. Union Pac. Corp.*, 8 F. Supp. 2d 940 (S.D. Tex. 1998) (damages due to delay of shipments); *Kansas City Power & Light Co. v. Union Pac. R.R. Co.,* STB 42095, 2007 WL 934378 (STB March 26, 2007) (STB decision related to contract for shipment of coal); *Pejepscot Indus. Park, Inc. v. Maine Cent. R. Co.,* 297 F. Supp. 2d 326 (D. Me. 2003) (breach of a contract to provide rail service to a shipper of scrap metal); *Burlington Northern R. Co. v. Surface Transp. Bd.,* 75 F.3d 685 (D.C. Cir. 1996) (a challenge to the STB's authority to order the filing of common carrier rates to take effect when a private contract between an electric utility and a railroad for the shipment of coal expired); *Siemens Power Transmission & Distribution, Inc. v. Union Pac. RR Co.,* 2005 WL 2647977, at *2 (S.D. Tex. Oct. 17, 2005) (in a case dealing with a contract for the shipment of transformers, the court explained, "[c]ontracts authorized by the Staggers Act, and therefore exempt from the Carmack Amendment, are those between shippers and carriers for 'specified services [provided] under specified rates and conditions.' . . . Most shipping agreements, including bills of lading, are now embodied in such private contracts.")(quoting § 10709(a)).

the lease it entered into with SCTRR is not an agreement to ship certain goods under specified conditions. Rather, the lease provides that Jefferson will supply railcars for use by SCTRR for transportation, in return for compensation, which is defined as "car service" under the ICCTA and is subject to regulation by the STB. As such, Jefferson's reliance on these "shipping contract" cases is misplaced, and the other cases cited by Jefferson do not concern federal preemption or § 10709.

A case that SCTRR and South Central Rail Management rely on, and which Jefferson does not address, is *San Luis Central Railroad Co. v. Springfield Terminal Railway Co.*, 369 F. Supp. 2d 172 (D. Mass. 2005). In that case, the court was faced with the precise question that is determinative here—whether an agreement by a railroad to use railcars owned by another rail carrier falls within the "private contract" exception to federal preemption under 49 U.S.C. § 10709. *Id.* at 176. San Luis, a rail carrier that owned freight cars, entered into an agreement with Springfield, another rail carrier, for Springfield to use San Luis's freight cars on its railroads. *Id.* at 173. Springfield had to provide an accounting of the car service and the "car hire" fees to San Luis. *Id.* at 174. San Luis sued Springfield, alleging various state law claims, including breach of contract, and seeking to recover unpaid car hire fees pursuant to their agreement. *Id.* Like SCTRR and South Central Rail Management do here, Springfield argued that San Luis's

state law claims were preempted by § 10501(b), and as Jefferson does here, San Luis argued that it entered into a private voluntary contract governed by § 10709. *Id.* at 176. The court held that because San Luis's claims fell within the scope of § 11704(c)(1), which authorizes a claim by a rail carrier to recover payment for a service, § 10501 preempted all of San Luis's state law claims. *Id.* at 176-77. In *San Luis*, the agreement was titled "Car Service and Car Hire Agreement," and San Luis alleged in its complaint that Springfield "owe[s] $36,212.54 in 'car hire.'" *Id.* at 173. While Jefferson's complaint does not contain the words "car hire," the lease specifically provides for "car hire accounting and earnings" that are subject to the Car Hire rules adopted by the STB for determining the car hire earnings.

In another analogous case, *Engelhard Corp. v. Springfield Terminal Railway Co.*, 193 F. Supp. 2d 385 (D. Mass. 2002), an owner of railcars specially built for shipping kaolin sued a railroad, asserting state law causes of action, including breach of contract, breach of implied-in-fact contract, and quantum meruit, and seeking to collect unpaid fees relating to the railroad's use of its railcars. *Id.* at 386-87. Despite the owner's argument that it entered into a private contract with the railroad under § 10709, the court held that the agreement was subject to the STB's overriding jurisdiction because the owner's causes of action necessarily relied on the mileage allowance tariff promulgated by

21

the STB, Tariff 6007.  *Id.* at 390 n.9 ("Moreover, Engelhard is able
to plead a contractual or quasi-contractual measure of damages only
by reference to the compensation schedule set out by the STB in
Freight Tariff 6007.").  The same is true here: any monies that may
be owed to Jefferson for alleged breaches of contract cannot be
measured without referencing the STB's rates pertaining to car
hire, because the lease itself relies on those rates by entitling
Jefferson to "100% of all off-line car hire earnings."  The court
in *Engelhard* then applied § 10501(b)'s preemption to the dispute
over the payment of fees for using the railcars, stating: "[t]he
concluding sentence of section 10501(b) is an unmistakable
statement of Congress's intent to preempt state laws touching on
the substantive aspects of rail transportation."  *Id.* at 389.
Finally, the court applied the two-year statute of limitations in
§ 11705(c) to the owner's claim for fees (which the court deemed a
§ 11704(b) claim), holding that "while Section 11705(c) refers only
to the filing of complaints before the STB, its statute of
limitations applies to section 11704(b) actions before the district
court as well."  *Id.* at 390.

     In sum, the lease at issue here is not between a rail carrier
and a "purchaser of rail services", i.e., a shipper, as required by
49 U.S.C. § 10709.  The lease is between two rail carriers for the
provision of rail cars for use by a carrier to provide service to
the public, which is defined as "car service" under 49 U.S.C. §

10102.  This is evidenced by the facts that the lease requires the railcars to bear the reporting marks of a licensed federal railroad, *see* 49 C.F.R. § 1033.1(1), specifically relies on the Car Hire rules for its implementation, and also references the Association of American Railroad's interchange rules.  Thus, § 10709 does not apply, and the parties to the lease are therefore subject to federal regulation pursuant to 49 U.S.C. § 11121 *et seq.* and 49 C.F.R. § 1033.1.  Jefferson's state law claims are not exempt from the preemption provision of § 10501 or the statute of limitations set forth in § 11705(b).  Because Jefferson did not file suit until over three years after the accrual of its claim, the action is time-barred.  For these reasons, SCTRR and South Central Rail Management are entitled to judgment on the pleadings.[8]

---

[8] Because all of Jefferson's state law claims against SCTRR and South Central Rail Management are due to be dismissed with prejudice for the reasons stated above, it follows that the court cannot allow Jefferson to re-name South Central Rail Management as a defendant in this action based on a theory that it is the alter-ego of SCTRR.  Accordingly, Jefferson's request to reserve the right to re-name South Central Rail Management as a defendant will be denied.

Additionally, and as noted previously, in the same pleading in which it answered Rail Connection's counterclaim, Jefferson purported to assert a "crossclaim" against SCTRR and South Central Rail Management for breach of contract and unjust enrichment (based upon the same facts giving rise to Jefferson's previous request for equitable relief asserted in its first amended complaint).  SCTRR and South Central Rail Management moved to dismiss or strike this "crossclaim" because the federal rules of civil procedure only provide for crossclaims to be asserted against a coparty, and SCTRR and South Central Rail Management are not co-parties to Jefferson.  *See* Fed. R. Civ. P. 13(g) ("A pleading may state as a crossclaim any claim by one

**Conclusion**

For the foregoing reasons, the motion for judgment on the pleadings filed by SCTRR and South Central Rail Management will be granted, which renders moot the issues raised in the motion to dismiss filed by those defendants.  The motion to strike filed by SCTRR and South Central Rail Management will also be granted.  A separate order will be entered effectuating this opinion.

DONE this 9th day of January, 2012.

---

party against a coparty . . ."); 1 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 13.71[1] (3d ed. 1997) (crossclaims may be pleaded only against coparties, and while the term "coparty" is not defined in the rules, several decisions describe a coparty as any party that is not an opposing party, and in other words, coparties are parties on the same side of the litigation) (*citing Georgia Ports Auth. v. Construzioni Meccaniche Industriali Genovesi, SpA,* 119 F.R.D. 693, 695 (S.D. Ga. 1988)(court construed coparty to mean any party other than opposing party))). Apparently seeing its error, Jefferson seeks leave from the court to re-style its "crossclaim" as a new count in its complaint instead, under Fed. R. Civ. P. 15.  Rule 15(a)(2) allows Jefferson to amend its complaint upon receiving leave from the court, and such leave "shall be freely given when justice so requires."  *Id.*  However, because all of Jefferson's state law claims against SCTRR and South Central Rail Management are due to be dismissed with prejudice as preempted by § 10501 of the ICCTA, Jefferson is also barred from asserting additional state law claims for breach of contract and unjust enrichment based on the same facts.  Accordingly, SCTRR and South Central Rail Management's motion to strike Jefferson's "crossclaim" will be granted, and Jefferson's request to amend its first amended complaint to assert additional state law claims for breach of contract and unjust enrichment will be denied.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE